## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| LARRY J. BIGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-cv-3359 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Larry J. Bigham appeals from the denial of his application for Social Security Disability Insurance Benefits and Supplemental Security Income (collectively "Disability Benefits") under Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 416(i), 423 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Bigham has filed a Motion for Summary Judgment (d/e 15), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 18).  The District Court has referred this matter for a Report and Recommendation.  Text Order entered January 7, 2013.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Bigham was born on July 27, 1965.  He completed the eleventh grade and part of the twelfth grade in high school and secured a GED. He was in the Army from November 1983 to October 1987.  Answer to Complaint (d/e 12), attached Certified Copy of Transcript of Record of Proceedings (R.), at 45, 47.  He subsequently worked as a truck driver. R. 177.  Bigham has suffered from diabetes, chronic obstructive pulmonary disease (COPD), asthma, and obesity.

On December 26, 2008, Bigham was injured in an automobile accident in which he was driving a vehicle that hit a tree.[1]  R. 255.  Bigham was driving under the influence of alcohol at the time of the accident. R. 53-54, 255.  Bigham suffered a fractured right femur, a fractured right scapula, a large laceration to his right leg, injuries to the soft tissue of his left knee, a laceration to the scalp, and a loss of consciousness.  R. 251-58, 321.  On December 27, 2008, Bigham underwent surgeries to repair the laceration on his leg and to set the broken femur.  R. 251-54.  The surgery required the use of a metal rod to set the femur.  R. 306.

On March 5, 2009, Bigham went to see his primary care physician, Dr. Ronald Johnson, M.D.  R. 381-84.  Bigham was progressing "pretty well

---

[1] The accident was not related to his work as a truck driver.  R. 47.

through his physical therapy and occupational therapy."  R. 381.  Bigham

was in a wheel chair because he still could not bear weight safely.  R. 382.

Dr. Johnson reported that when he rotated Bigham's shoulder, Bigham

"had quite a loud snap and pain nearly down to his elbow."  R. 382; see

R. 383.  Bigham had good circulation and sensation peripherally, except

around his wounds.  R. 383.  Dr. Johnson refilled Bigham's prescriptions as

needed.  R. 382-83.

On April 24, 2009, Dr. Charles Wabner, M.D., reviewed Bigham's

medical records and prepared a residual functional capacity assessment.

Dr. Wabner opined that Bigham could lift 50 pounds occasionally and 25

pounds frequently; stand and/or walk six hours in an eight-hour workday;

and sit for six hours in an eight-hour workday.  R. 360-63.  Dr. Wabner

opined that Bigham should have this functional capacity within 12 months

as he healed from his injuries from the accident.  R. 360, 366.  Dr. Wabner

concluded,

> Claimant is credible.  His function is severely limited due to leg
> laceration.  He is currently using a walker and a wheelchair.
> Limitations are not expected to remain at this level for twelve
> months.

R. 366.

On April 30, 2009, Bigham saw Dr. Johnson again.  By this time,

Bigham was using a cane to walk.  Bigham complained that he was not

sleeping.  Dr. Johnson's neurologic examination noted headaches, but no dizziness, weakness, or numbness.  The respiratory examination noted normal breath sounds, no rales, no rhonchi, and no wheezing.  Bigham weighed 252 pounds at the examination.  Dr. Johnson's assessment was depression, diabetes, and obesity.  R. 369-71.

On May 14, 2009, Bigham went to see Dr. Johnson because he was passing out, especially when he was coughing.  Bigham reported having up to four spells a day.  R. 372.  Bigham and his ex-wife/girlfriend Jeanne Bigham reported that during the spells, he blacked out, drooled out of the left side of his mouth, "looses stool," and jerked his head and neck. R. 373.[2]  On examination, Bigham's gait was normal, but he was using crutches at this time to walk.  R. 374.  Dr. Johnson noted in Bigham's neurological exam "Romberg's sign normal, Finger nose test normal, Rapid alternating movements abnormal, Knee reflexes abnormal, Ankle reflex abnormal, Light touch sensation normal, Pin prick sensation of foot normal."  R. 374.   Dr. Johnson listed seizures in his assessment of Bigham's condition.  R. 374.  Dr. Johnson's plan was to refer Bigham to a neurologist "ASAP."  R. 375.

---

[2] Bigham referred to Jeanne Bigham at various times as his ex-wife, his wife, and his girlfriend.  See e.g., R. 44, 67.  Bighams have lived together since 2002.  R. 67.

Dr. Johnson referred Bigham to a neurologist, Dr. Yen-Yi Peng, M.D. Before he saw Bigham, Dr. Peng sent Bigham an undated questionnaire and a seizure calendar on which to keep a record of his seizures.  R. 470-77.  Bigham categorized his seizures into four types.  He described the mildest, category A, as "wavy feeling, eyes move and arms & face tingle, fatigue."  R. 470.  He described the most severe, category D, as "Can't breathe, unresponsive, blurred vision when finished and body moves (especially legs)."  R. 471.[3]  Bigham wrote the appropriate letter on the day of the calendar for each type of seizure he experienced on that day.

The seizure calendar ran from May 3, 2009, until June 18, 2009, the date of Bigham's first visit with Dr. Peng.   R. 472-73.  The record does not indicate the date on which Bigham received the calendar from Dr. Peng, but Dr. Johnson did not refer Bigham to Dr. Peng until sometime after May 14, 2009.  Thus, some portion of the calendar may be a contemporaneous log of seizures as they occurred and some portion may be Bigham's summary of his recollection of the seizures he experienced in May and June before he started keeping the calendar.

On June 18, 2009, Bigham saw Dr. Peng.  R. 387-88, 447.  Bigham reported staring spells once a day and passing out once or twice a week.

---

[3] The instructions with the seizure calendar directed Bigham to identify the categories as A, B, C, and D. R. 471.

Dr. Peng's neurological exam was normal.  Dr. Peng observed that Bigham was able to walk without any help, but his gait was "wide-based."  R. 447. Dr. Peng's impression stated, "Spells of change of mental status, could be seizure, could be epileptic seizure, and could be nonepileptic seizure." R. 447.  Dr. Peng put Bigham on anti-convulsant medication.  R. 386-87, 447.  Dr. Peng told Bigham that he should not drive.  R. 387, 447.

On July 9, 2009, Bigham underwent arthroscopic surgery on his right knee.  R. 405-06.  On July 23, 2009, Bigham went to see Dr. Johnson again.  R. 442-45.  Bigham was complaining primarily of depression and pain.  He also reported continuing seizures.  Dr. Johnson's neurological examination noted headaches, dizziness, and weakness.  Dr. Johnson assessed Bigham with depression, diabetes, and obesity.  R. 445

On July 28, 2009, Bigham went to see Dr. Peng again.  In the interim, on July 15, 2009, Bigham had undergone a 24 hour video EEG monitoring at Memorial Medical Center in Springfield, Illinois.  R. 467.  The EEG was normal, but the video recorded two small spells in which Bigham's leg was shaking.  The monitoring did not record any more significant spells.  R. 449. Dr. Peng stated that Bigham most likely was having non-epileptic seizure. Dr. Peng stated in his notes, "**I asked the patient this spell could be related to stress.  The patient is not against this idea.**"  R. 449

(emphasis in the original).   Dr. Peng's impression was "**Spells of change of mental status most likely nonepileptic seizures.**"  R. 449 (emphasis in original).  Dr. Peng, however, noted that "true superimposed epileptic seizures could not be completely excluded."  R. 449.  Dr. Peng continued Bigham's medications.

On August 3, 2009, state agency physician Dr. Towfig Arjmand, M.D., reviewed Bigham's medical records and prepared a residual functional capacity assessment.  R. 394-401.  Dr. Arjmand opined that Bigham could occasionally lift 50 pounds and frequently lift 25 pounds; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally use ramps or stairs; never use ladders, ropes, or scaffolds.  R. 395-96.  Dr. Arjmand further opined that Bigham should avoid hazards such as machinery or heights.  R. 398.  Dr. Arjmand stated that Bigham's injuries from the accident were hearing and his "functional level should be improved" to the level to which he opined within twelve months.  R. 395.

Dr. Arjmand further noted that Bigham "had different types of spell which may or may not be epileptic."  R. 396.  Dr. Arjmand opined that Bigham was limited in his use of ramps, stairs, ladders, ropes, and scaffolds, and the need to avoid hazards because Bigham had a history of

seizures.  R. 396, 398.  Dr. Arjmand concluded his assessment with the

following:

> Claimant is credible.  His function is severely limited due to leg
> laceration.  He is currently using a walker and a wheelchair.
> Limitations are not expected to remain at this level for twelve
> months.

R. 401.

On September 17, 2009, Bigham went to see Dr. Peng again.

Bigham's mother and Jeanne Bigham went with him to the appointment.

Bigham reported small spells once a day and major spells once a week.

R. 453.  Dr. Peng increased his medication and suggested the possibility of

conducting a week-long EEG video monitoring.  R. 453.

On December 31, 2009, Bigham went to see Dr. Johnson.  R. 422-

25.  Bigham reported still having seizures.  Bigham reported that testing

was done on his feet and he could not feel in some of his toes.  Bigham

reported that he had diabetic neuropathy.  R. 422.  Dr. Johnson, however,

noted no numbness in his neurological examination.  R. 423.

On April 7, 2010, Bigham went to see an endocrinologist, Dr. Smita

Gupta, M.D.  Bigham reported that he had not been watching his diet for six

or seven months.  During that time, Bigham's blood sugar levels had been

elevated.  During examination, Dr. Gupta noted reduced sensation in

Bigham's toes.  Dr. Gupta also noted some bilateral wheezing, but no creps

and no rhonchi.  R. 456-57.  After examination, Dr. Gupta assessed Bigham with uncontrolled diabetes with diabetic peripheral neuropathy, retinopathy, and nephropathy.  R. 457.  Dr. Gupta started Bigham on insulin, reduced his other diabetes medications, and referred him to a dietician.  R. 457.

On June 3, 2010, Bigham went to see Dr. Johnson again.  Bigham reported that he was using a nebulizer four times a day to aid with his breathing.  R. 487. Dr. Johnson found numbness in his neurological examination.  R. 488.  Dr. Johnson's also observed normal breath sounds, no rales or wheezing, and the presence of rhonchi.  R. 489.

On June 26, 2010, Bigham went to the Veteran's Administration (VA) in Columbia, Missouri, for a pulmonary function examination.  The tests showed diminished lung capacity.  Bigham's FEV1 was 47% of expected range without bronchodilation and 51% with.[4]  His FVC was 65% of the expected level.[5]  His lung diffusion capacity was also reduced to 68% of normal.  R. 485.

On October 5, 2010, Bigham went back to the VA.  He went this time to establish himself as a regular patient because he had lost his other insurance.  R. 508-09.  Bigham reported that he was out of his medicines

---

[4] FEV1 means one-second forced expiratory volume.  See 20 C.F.R. Part 404, Subpart P Appendix 1, Listing 3.00E.
[5] FVC means forced vital capacity.  See 20 C.F.R. Part 404, Subpart P Appendix 1, Listing 3.00E.

for three or four weeks prior to coming.   His primary complaint was pain in his right side from the automobile accident.  R. 509.  Bigham reported pain including right hip pain.  R. 510.  The VA physician commented that the only solution to the hip pain may be a hip replacement.  R. 510.  Bigham reported no pain in his chest, but the VA physician diagnoses asthma and hoarseness.  R. 511.  The VA physician also noted rhonchi and end expiratory wheezing.  R. 512.  The neurological examination noted numbness in his feet.  Bigham reported that he had a seizure disorder, but "Has had no breakthrus (sic) since he has been without meds."  R. 512. Bigham had an abnormal and painful gait.  R. 512-13.  Bigham had diminished strength in his right upper and lower extremities.  R. 513. Bigham had diminished motion in his fingers of his left hand.  R. 514.

On November 17, 2010, the Administrative Law Judge (ALJ) held an evidentiary hearing.  R. 39-77.  The hearing was held by video conference. The ALJ was in Peoria, Illinois.  Bigham, his attorney, and Jeanne Bigham appeared in Springfield, Illinois.  Vocational Expert Bonnie Gladden appeared in Peoria, Illinois.  R. 41.  Bigham testified first.  Bigham testified that he was forty-five years old, was five feet eleven inches tall and weighed 245 pounds.  R. 43.  He testified that he lived in a ground-floor apartment with Jeanne Bigham.  R. 44.

The ALJ asked Bigham to state "in your own words why is it that you're unable to work at this time?"  R. 48.  Bigham responded,

> Well, sir, I have seizures where I just completely go out of it. And my lung capacity is not very good either.  I have COPD. My hip and my right leg, I'm in pain –

R. 48.  The ALJ stopped Bigham and asked about each problem separately, starting with the seizures.  R. 48.

Bigham testified that he had a seizure the day before the hearing.  He testified that he had between three and four seizures a week.  R. 48.  He testified that the VA took him off his seizure medicine so they could test him to "test and see what's going on with those."  R. 49.  Bigham testified that while he was on seizure medication, he had fewer small seizures, but still had larger seizures two to three times a week.  R. 49.  Bigham testified that he never went to a hospital due to a seizure.  R. 49.  The only test performed to diagnose the seizures was the twenty-four hour EEG.  R. 50.

The ALJ asked Bigham for his seizure log.  Bigham testified that he left it at home.  Bigham also testified that he quit taking the log "a couple of months ago."  R. 51.  He testified that his new doctors did not tell him to keep a log, so he stopped.  R. 52.  The only seizure log produced was the seizure calendar from May 3, 2009, to June 18, 2009.  R. 51, R. 470-73.

Beyond the seizures, Bigham testified, "I have only 47 percent lung capacity and I have a steel rod in my right leg.  And I can't lift near as much as I used to because I broke my shoulder and my collarbone and my shoulder blade.  And I still get pain in it."  R. 52.  Bigham testified that he could not sit, stand, or lie down for very long because of the rod in his right leg, "I have to keep moving to keep it from stiffening up real bad."  R. 52.  Bigham testified that he could stand for fifteen minutes at a time, and sit for thirty to forty-five minutes at a time.   R. 53.

Bigham testified that he lost his driver's license because he did not take a breathalyzer test at the scene of the automobile accident.  He later allowed the license to lapse because he could not afford the fines and fees to reinstate the license and because he could not drive because of the seizures.  R. 53-56.

Bigham testified that he spent most days watching television.  He watched television ten to twelve hours a day.  R. 58.  He prepared meals, avoided doing laundry because of the lifting involved, and did not do any other household chores.  He went to the grocery store "as long as it's not going to be one of those big store extended stays."  R. 57.  He went out to visit friends and family twice a month, and people came to visit with him three to four times a month.  R. 58.

On examination by his attorney, Bigham testified that he lost his medical insurance when his last daughter turned 18 and left home.  R. 58. He testified that he was without medical care for three to four months as a result.  R. 58.

Bigham testified that the small seizures were "almost non-existent" when he was on the medication.  He had two to three big seizures a week on the medication.  R. 59.  Bigham testified that in a big seizure he blacked out.  When he woke up he usually had urinated on himself.  He testified that he usually slept for five to six hours after a big seizure.  R. 60-61. Bigham testified that he did not notice a small seizure, but Jeanne Bigham described them to him as twenty to thirty seconds when he had a blank stare on his face he drooled slightly.  He was usually slightly tired after a small seizure.  R. 60.

Bigham then testified about his other problems.  He testified that he got winded when he walked.  He also testified that certain odors caused him to cough.  R. 61.  He testified that his hip caused him pain.  He testified that he was in pain sitting at the hearing, "My hip is killing me right now.  It's like a toothache in my – right here.  In my hip."  R. 62.  Bigham testified that he had to fidget and move to get weight off his hip.  Bigham testified that

his knee caused him pain also, especially when he lifted objects.  He testified that he could not lift more than 15 pounds.  R. 62.

Bigham's attorney then asked Bigham about his diabetes.  Bigham testified that his diabetes was better once he got on his medicine.  R. 63.

Jeanne Bigham then testified.  She testified that she and Bigham had lived together continuously for eight years.  R. 67.  She described Bigham's seizures.  She testified that the small ones last 30 to 60 seconds.  She testified that "his eyes will vibrate but they don't roll but he still shakes everywhere.  And it's just not as hard on him.  He doesn't wet his pants or anything like that."  R. 68.  She testified that he has had a small seizure every day or every other day since going off the seizure medicine.  R. 69.

Jeanne Bigham testified that Bigham had three to four big seizures a week.  She testified that he went no more than four or five days between big seizures.  R. 68.  She testified that the big seizures lasted three or four minutes.  She testified that he shook and his eyes rolled back in his head.  R. 68-69.  She testified that after a big seizure he cleaned himself up and slept for "the rest of the afternoon."  R. 69.  She testified that "he's just wiped out" after a big seizure.  R. 69.

Bonnie Gladden then testified.  The ALJ asked Gladden the following question:

> I'd like you assume we have an individual that same age,
> education and experience as the claimant. Excuse me. This
> individual is limited to medium work and needs to avoid
> concentrated exposure to dusts, odors, gases, and fumes.
> How would these restrictions affect the performance of
> claimant's past relevant work?

R. 71. Gladden opined that such a person could perform Bigham's past

relevant work as a truck driver. R. 71.

The ALJ then asked Gladden:

> Now I'd like you to assume, ma'am, an individual the same
> age, education and experience as the claimant. This
> individual is limited to light work. Needs to avoid concentrated
> exposure to dust, odors, gases and fumes. And is limited to
> occasional postural activities. And needs to avoid even
> moderate exposure to unprotected heights. How would these
> restrictions affect the performance of claimant's past relevant
> work?

R. 71-72. Gladden opined that the person could not perform Bigham's past

work as a truck driver. R. 72. Gladden opined that such a person could

work as a dispatcher, an assembler of small products and a hand packer.

She further opined that 31,000 assembler jobs and 19,000 hand packer

jobs existed in Illinois. R. 72.

The ALJ then asked Gladden:

> Okay. Now I'm going to take the same hypothetical and I'm
> going to reduce it to sedentary. So we're sedentary, needs to
> avoid concentrated exposure to dust, odors, gases and fumes.
> Limited to occasional postural activities. Needs to avoid even
> moderate exposure to unprotected heights.

R. 72-73.  Gladden opined that such a person could work as a dispatcher, a telemarketer, and a dowel inspector or quality control inspector.[6] Gladden stated that 16,000 telemarketer jobs, and a total of 23,000 total quality control inspector jobs, including 5,000 dowel inspector jobs, existed in Illinois.  R. 73.  Gladden testified that the jobs she listed at the light and sedentary level were representative of the types of jobs available rather than an exhaustive list.  R. 72-73.

The ALJ asked whether Gladdens' opinions would change at the light or sedentary level if the ALJ added a limitation that the person could not use ropes, ladders, or scaffolds.  Gladden stated that the additional limitation would not change her answers.  R. 73-74.

The ALJ further asked Gladden to assume the person would miss four or more days of work per month, or assume the person would need to take extra breaks that would render the person to "have less than 80 percent productive while on the job."  R. 74.  Gladden opined that either limitation would limit the person's ability to keep a job.  R. 74-75.

On examination by Bigham's attorney, Gladden opined that the jobs she identified would not allow the person to move around at will.  Gladden

---

[6] Gladden initially stated that the dispatcher job was light work, but then corrected herself to state that the job was considered sedentary.  R. 73, 74.

also testified that a person generally cannot retain a job if he has more than

one to one and one-half days of unexcused absences per month.  R. 76.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on December 1, 2010.  R. 18-34.  The

ALJ followed the five-step analysis set forth in Social Security

Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.

Step 1 requires that the claimant not be currently engaged in substantial

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.

20 C.F.R. §§ 404.1520(c), 416.920(c).

If true, Step 3 requires a determination of whether the claimant is so

severely impaired that he is disabled regardless of the claimant's age,

education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).

To meet this requirement at Step 3, the claimant's condition must meet, or

be medically equivalent to, one of the impairments specified in 20 C.F.R.

Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d),

416.920(d).  If the claimant's impairments, combination of impairments, do

not meet or equal a Listing, then the ALJ proceeds to Step 4.

Step 4 requires the claimant not to be able to return to his prior work

considering his age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  The ALJ must

determine the claimant's RFC in order to perform this analysis.  If the

claimant cannot return to his prior work, then Step 5 requires a

determination of whether the claimant is disabled considering his RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(f),

416.920(f).

The claimant has the burden of presenting evidence and proving the

issues on the first four steps.  The Commissioner has the burden on the

last step; the Commissioner must show that, considering the listed factors,

the claimant can perform some type of gainful employment that exists in

the national economy.  Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345,

352 (7th Cir. 2005); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Bigham met his burden at Step 1.  The ALJ found

that Bigham had not engaged in substantial gainful activity since

December 27, 2008.  R. 24.  At Step 2, the ALJ found that Bigham suffered

from severe impairments of post broken femur and scapula, post rod

replacement in leg, asthma, COPD, and obesity.  R. 24.  The ALJ found

that Bigham's diabetes was non-severe based on Bigham's testimony that

the disease was well managed by his medications.  R. 24.

The ALJ also found at Step 2 that Bigham's seizures were non-severe.  The ALJ found that Bigham and Jeanne Bigham's statements regarding the seizures were not credible and no medical test results confirmed a diagnosis of a seizure disorder.  The ALJ stated that Bigham and Jeanne Bigham's statements about the alleged seizures were inconsistent.  Bigham and Jeanne Bigham testified that he had seizures on a weekly basis, but Bigham "reported having no breakthrough seizures since he had been without medication."  R. 24-25.  The ALJ also noted that the seizure log from May 3, 2009, to June 18, 2009, was inconsistent with the testimony.  The log listed four kinds of seizures rather than two, and the log listed many more seizures on a daily and weekly basis.  R. 25.  The ALJ also relied on the one study performed, the EEG was normal.  In addition, no other tests, such as an MRI or CAT scan had been performed. The ALJ also relied on the fact that Bigham had never needed to go to the hospital emergency room as a result of any seizure.  R. 25.[7]

At Step 3, the ALJ found that Bigham's impairments or combination of impairments did not meet a Listing.  R. 26.  The ALJ considered the Listings for musculoskeletal and respiratory problems, and the impact of

---

[7] The ALJ also found that Bigham's depression was non-severe.  R. 25.  Bigham does not challenge this finding in his appeal.

Bigham's obesity on those problems.  R. 26-28 (citing Listings 1.06, 1.07, 3.02, and 3.03; and SSR 02-1p).

At Step 4, the ALJ determined that Bigham had the RFC to medium work except that he must avoid concentrated exposure to dusts, odors, gases, and fumes.  The ALJ again found the claims about seizures to not be credible.  The ALJ found that Bigham's other impairments were consistent with this RFC finding.  R. 28-31.  The ALJ then found that Bigham could perform his prior work as a truck driver based on Gladden's testimony.  R. 31-32.

In the alternative, the ALJ also assumed for purposes of analysis, that Bigham actually had a seizure disorder as claimed.  The ALJ found that giving Bigham all of the benefit of the doubt regarding the seizures, he would have the RFC to perform sedentary work that was limited to occasional postural activities; less than moderate exposure to unprotected heights; and no climbing ladders, ropes, or scaffolds; and in which he would need to avoid concentrated exposure to dusts, odors, gases, and fumes.  R. 33.   The ALJ found at Step 5 that, even if he was so limited by the seizure disorder, he could still work as a dispatcher, telemarketer, or dowel inspector.  The ALJ further found that a significant number of these

jobs existed in Illinois based on Gladden's testimony.  The ALJ, thus, concluded that Bigham was not disabled.  R. 33.

Bigham appealed to the Appeals Council.  On August 5, 2011, the Appeal Council denied Bigham's request for review.  The ALJ's decision then became the decision of the Commissioner.  R. 1.  Bigham then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence.  The central issue is the ALJ's finding that Bigham and Jeanne Bigham's claims and testimony about seizures was not credible.  The ALJ explained the basis of his finding and that basis has some support in the record.  The seizure calendar in the record listed four types of seizures, but Bigham and Jeanne Bigham testified that there were only two types of seizures.  Bigham and Jeanne Bigham testified that he had big seizures every week even when he was on the seizure medicine, but Bigham reported to the VA that he did not have any "breakthrus", which the ALJ understood to be breakthrough seizures, for a month after he ran out of the medicine.[8]  Bigham further claimed to have kept seizure logs at least a year from June 18, 2009, until a couple of months before the November 17, 2010, hearing, but he did not produce them at the hearing, he did not provide copies to his attorney, and no copies exist in any of the medical records.   In addition, the EEG study was normal.  This evidence provides some support for the ALJ's determination that Bigham and Jeanne Bigham's testimony and reports to doctors about seizures was not credible.  Because some support exists in

---

[8] Bigham does not dispute the ALJ's interpretation of the term "breakthrus".

the record, the Court will not disturb the credibility finding.   <u>Elder v. Astrue</u>,

529 F.3d at 413-14.  This credibility finding supports the ALJ's conclusion

at Step 2 that the seizures were non-severe.[9]

The ALJ's RFC finding at Step 4 is not supported by substantial

evidence because the ALJ did not consider Dr. Peng's restriction on

Bigham's driving.  The ALJ's finding was supported by the functional

capacity assessments of Drs. Wabner and Arjmand.  Both doctors opined

that Bigham would be able to lift 50 pounds occasionally and 25 pounds

frequently within a year after the accident.  Work that requires lifting up to

50 pounds and frequently lifting and carrying 25 pounds is considered

medium work.  20 C.F.R. § 404.1567(c).  Dr. Arjmand, further, included

limitations on the RFC to accommodate Bigham's seizure disorder.  R. 396,

398.  Dr. Peng, however, told Bigham not to drive.  Dr. Peng based this

restriction both on the reports of Bigham and Jeanne Bigham and on the

two mild shaking incidents that were recorded in the 24-hour EEG video

monitoring.  The ALJ needed to explain why he did not consider Dr. Peng's

limitation on driving in light of the video evidence.

The Court will not reverse, however, because the alternate finding as

Step 5 is supported by substantial evidence.  At Step 5, the ALJ made an

---

[9] The ALJ's findings at Step 3 that the effects of the injuries and that Bigham's breathing problems did not meet a Listing are supported by the medical record.  Bigham does not challenge these findings on appeal.

alternate finding to address the possibility that Bigham might actually have a seizure disorder.  The ALJ's alternate RFC of limited sedentary work is supported by Dr. Arjmand's opinions.  Dr. Arjmand incorporated Bigham's seizure disorder into his RFC assessment.  Gladden's opinion that a person of Bigham's age, education, and experience, with the alternate RFC, could perform the jobs of dispatcher, telemarketer, and dowel inspector supports the finding at Step 5 that Bigham was not disabled.  The jobs identified by Gladden were also consistent with Dr. Peng's instruction not to drive.  The ALJ's conclusion at Step 5 that Bigham was not disabled, therefore, was supported by substantial evidence.

Bigham urges the Court to review and overturn the ALJ's credibility finding.  The Court has carefully reviewed the record and is convinced that the ALJ explained the basis for his finding and that some support exists in the record for that finding.  The Court, therefore, should not overturn the credibility determination.  Bigham's arguments to the contrary are not persuasive.

Bigham also argues that the ALJ erred at Step 2 because diabetes was a severe impairment.  The Court disagrees.  An impairment is severe for purposes of Step 2 if it "significantly limits an individual's ability to do basic work activities."  Taylor v. Schweicker, 739 F.2d 1240, 1242-43

(7th Cir. 1984) (citing 20 C.F.R. § 404.1521(a)).  Step 2 of the Analysis

requires a threshold showing that the impairment has an effect of a

person's functional abilities to work that is more than minimal.  See Bowen

v. Yuckert, 482 U.S. 137, 141 (1987); Johnson v. Sullivan, 922 F.2d 346,

347 (7th Cir. 1991).  Bigham testified that he could not work because of his

breathing problems, his injuries from the accident, and his seizures.  R. 48.

He nowhere stated that his diabetes limited his ability to work.  Rather, he

testified that his diabetes was well controlled since he went to the VA and

got back on his medicine.  R. 63.  The medical records showed that his

diabetes was uncontrolled in the past and that Bigham had some diabetic

neuropathy.  None of the medical records, however, indicated that Bigham

had any pain or functional limitations as a result of the neuropathy.  In light

of this evidence, the ALJ's decision not to list diabetes as a severe

impairment at Step 2 was supported by substantial evidence.

Bigham argues that the ALJ erred because he failed to consider in his

alternate holding whether Bigham's seizures met a Listing at Step 3.  Any

failure to perform an alternate analysis under Step 3 was harmless error

because the outcome would not change.  See Spiva v. Astrue, 628 F.3d

346, 353 (7th Cir. 2010). The Listings for seizure disorders require either

professional observation or testimony by witnesses other than the claimant.

Listing 11.00 A.  The record contains no professional observation of any seizure.  Bigham failed to produce the seizure log that documented the frequency of seizures.  The only evidence was the testimony of Jeanne Bigham.  Given the ALJ's credibility finding, the Court sees no point in remanding for an alternate Step 3 analysis based on her testimony.  The outcome clearly would not change.

WHEREFORE this Court recommends that the Defendant Commissioner's Motion for Summary Affirmance (d/e 18) should be ALLOWED, Plaintiff Larry Bigham's Motion for Summary Judgment (d/e 15) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:     January 30, 2013

_____*s/ Byron G. Cudmore*_____
UNITED STATES MAGISTRATE JUDGE